**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH GRECO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SUBGALLAGHER INVESTMENT TRUST,** | : | |
| **PATRICIA MOORE, Individually and as** | : | |
| **Trustee of SubGallagher Investment** | : | |
| **Trust, MICHAEL A. CASEY, SCOTIA** | : | |
| **INTERNATIONAL OF NEVADA,** | : | |
| **INC, and MAX WARREN BARBER** | : | **NO. 19-2922** |

**MEMORANDUM OPINION**

**Savage, J.**                                                        **July 29, 2020**

This case arises out of plaintiff Joseph Greco's claim that the defendants engaged in a scam involving several players across several states to defraud him.  As part of a deal to enable a California-based company to procure funding to acquire a credit facility, Greco entered into agreements with Scotia International of Nevada, Inc. ("SION") and SubGallagher Investment Trust ("SGIT"), a Wyoming citizen and Michael Casey's client, to secure four million dollars that he invested in the California company.  In short, he alleges the defendants engaged in a conspiracy to swindle him out of the four million dollars.

Moving to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), defendants Casey, a Texas citizen, and SION and Max Warren Barber, citizens of Utah, contend that they do not have sufficient contacts with the Commonwealth of Pennsylvania and have not purposefully directed any conduct at Pennsylvania to justify the exercise of jurisdiction over them.  Greco, who resides and conducts his business operations in Pennsylvania, maintains that the moving defendants

are subject to personal jurisdiction because they aimed their intentional tortious conduct at Pennsylvania, causing him to feel the brunt of the resulting harm here.

We conclude that Greco has not met his burden of establishing the existence of specific personal jurisdiction over the moving defendants.[1]  Rather than dismiss the action, we shall transfer it to the United States District Court for the District of Utah where it could have been brought.[2]

## Background

Greco's amended complaint tells a tale of classic fraud.  In mid-2018, The Tribe Companies, Inc. ("Tribe"),[3] a California-based agricultural business, asked Greco to help it and six of its affiliates[4] procure funding to acquire a credit facility.  Greco learned about Tribe when a friend introduced him to one of Tribe's principals, Robert Kurz.[5]  After Kurz and two other principals of Tribe made a presentation to Greco about the company's business focus, marketing and strategic plans, Greco agreed to deposit four million dollars on Tribe's behalf with a fiduciary to raise capital.[6]

---

[1] After defendants SGIT and Patricia Moore failed to respond to the complaint, we granted the plaintiff's motion for entry of default judgment against them.  *See* Doc. No. 62.  Those defendants filed a motion to set aside the judgment and vacate the default, which we denied.  *See* Doc. No. 121.

[2] Because we lack jurisdiction and are transferring the matter pursuant to 28 U.S.C. § 1631, we do not address the defendants' contentions of improper venue under Rule 12(b)(3), *forum non conveniens*, failure to state a claim for relief under Rule 12(b)(6) and failure to join an indispensable party under Rule 12(b)(7).

[3] Although Tribe's full name is listed as "The Tribe Companies, LLC" in all of the documents attached to the amended complaint, Greco calls it "The Tribe Companies, Inc." in the amended complaint. Am. Compl. (Doc. No. 23) ¶ 10.

[4] Tribe's affiliates were farms in California engaged in commercial cannabis cultivation.  Doc. No. 54-3 at ECF 80-85; Greco dep. (Doc. No. 114-4) at 45.

[5] Greco dep. at 43-44.

[6] Am. Compl. ¶¶ 10-11; Greco dep. at 47-48, 50, 52.  According to Greco, Tribe needed a "significant amount of money to be deposited with a fiduciary . . . to drive the credit facility."  Greco dep. at 52.

During the summer of 2018, Nik Korakianitis, who knew both Barber[7] and Kurz, introduced Tribe and Greco to Barber and proposed SION as the fiduciary for the deposit.[8]   Greco engaged Sharlotte Croxford,[9] a bond broker based in Arizona, to find a surety company that could provide a financial guarantee surety bond to protect his four million dollar deposit.[10]   Croxford "introduced" SGIT and Casey, its attorney, to Ryan Wertman, trustee for The Evolant Blind Trust ("Evolant"),[11] and recommended SGIT to secure Greco's high risk security bond.   In endorsing SGIT, she stated that each of its bonds was backed by an ITR-Irrevocable Trust Receipt and it had "the resources available to mitigate any losses and perfect subrogation rights."[12]

On August 27, 2018, several agreements were executed to enable Tribe to obtain its credit facility.[13]   In a promissory note in favor of Evolant, Tribe and its affiliates

---

[7] Barber and Korakianitis knew each other from gold trading with each other.  Barber dep. (Doc. No. 117-1) at 238, 249-50.

[8] *Id.* at 181, 193-94, 199, 248.  Crawford described SION as a company that invests in major mining and construction projects worldwide and is worth billions of dollars, ten million dollars of which is in gold bullion.  *See* Aug. 17, 2018 email from Croxford to SGIT (Doc. No. 114-11) at ECF 2.

[9] Kurz found Croxford and told Greco about her.  Greco dep. at 187.

[10] Aug. 21, 2018 email from Croxford to Ryan Wertman (Doc. No. 23-3); Greco dep. at 186-87, 189.

[11] Greco, who describes himself as an "affiliate" of Evolant, and Evolant entered into various agreements with Tribe in connection with the transactions at issue.  Compl. (Doc. No. 1) ¶ 10; Am. Compl. ¶ 11.  On July 1, 2019, Greco assigned all claims he had against the defendants to Evolant, which was the plaintiff when the original and amended complaints were filed.  Am. Compl. ¶ 49.  Barber, SION and Casey contend that Evolant lacked standing to bring the action because it was not a party to the agreements upon which the claims were based and Greco was the real party in interest.  Consequently, Greco rescinded the assignment and he was substituted as the plaintiff.  Certification of Greco (Doc. No. 40-3) ¶ 10; Doc. No. 61.

[12] Am. Compl. ¶ 28; Aug. 21, 2018 email from Croxford to Wertman; Greco dep. at 194-197, 214-15.

[13] Am. Compl. ¶ 11.

acknowledged Evolant's pledge to deposit four million dollars with third-party fiduciary SION on Tribe's behalf.  Tribe agreed to pay Evolant interest at a rate of two percent per month on the outstanding principal, pay the entire outstanding principal twelve months after the execution of the note, pay $40,000.00 for Evolant's transaction expenses and grant Evolant Class C Units in Tribe equal to nine percent of its outstanding equity.[14]  The note contained a forum-selection clause providing that Tribe and Evolant consented to jurisdiction in any Pennsylvania court in any legal action or proceeding arising out of or relating to the note.[15]

Under the terms of a Deposit Agreement entered into between Greco and SION, Greco agreed to deposit four million dollars on Tribe's behalf with SION.[16] Schedule 1 to the Deposit Agreement reflected that Greco's bank account was with Citibank located at "111 Wall Street, New York, NY 10013," and SION's account was with Wells Fargo Bank located in Salt Lake City, Utah.[17]  The Deposit Agreement required SION to issue a surety bond naming Greco as beneficiary, and to return the full deposit unencumbered to Greco one year and one day later, or thirty days after Greco requested the return of the deposit, or immediately in the event of SION's default.[18]  Although SION could use the funds at its sole discretion, the purpose of the deposit was to provide confidence to Tribe's

---

[14] *Id.* ¶ 12; Promissory Note, dated Aug. 27, 2018 (Doc. No. 54-3 at ECF 64-71).  *See also* Security Agreement between Evolant and Tribe, dated Aug. 27, 2018 (Doc. No. 54-3 at ECF 72-78).

[15] Promissory Note ¶ 9 (Doc. No. 54-3 at ECF 66).

[16] Am. Compl. ¶ 13; Deposit Agreement, dated Aug. 27, 2018 (Doc. No. 23-1 at ECF 2-6).

[17] Deposit Agreement, Schedule 1 (Doc. No. 23-1 at ECF 6).

[18] Am. Compl. ¶¶ 15-17; Deposit Agreement (Doc. No. 23-1 at ECF 2-4).

prospective lenders and investors.[19]  The Deposit Agreement contained a forum-selection clause in which the "parties submit[ted] to the courts of Utah as the sole and exclusive jurisdiction to settle any disputes arising" out of the agreement.[20]

SION, as fiduciary, and SGIT, as guarantor, entered into a Financial Guarantee and a Bond Agreement in favor of Greco, memorializing SGIT's obligation to secure the return of the deposit to Greco.[21]  In the Financial Guarantee, SGIT promised to return the deposit to Greco within twenty-five days of receiving notice from Greco of SION's default.[22]  In the Bond Agreement, SGIT agreed to segregate at least four million dollars in liquid assets from its general pool of assets and ensure that these assets would not be encumbered, leveraged or otherwise depleted during the term of the guarantee.[23]  In connection with SGIT providing the Financial Guarantee and the Bond Agreement, Greco paid Croxford a $280,000.00 bonding fee for SGIT to secure its bond and guarantee. Portions of the fee went to SGIT and Casey.[24]

On April 30, 2019, Greco's counsel notified SION that Greco was exercising his right under Section 2.4 of the Deposit Agreement to demand the return of the deposit within thirty days.[25]  On May 31, 2019, after SION failed to return the deposit, Greco's

---

[19] Am. Compl. ¶ 14; Deposit Agreement (Doc. No. 23-1 at ECF 2).

[20] Deposit Agreement ¶ 12 (Doc. No. 23-1 at ECF 5).

[21] Financial Guarantee, dated Aug. 27, 2018 (Doc. No. 23-2 at ECF 4-5); Bond Agreement, dated Aug. 27, 2018 (Doc. No. 23-2 at ECF 2); Am. Compl. ¶¶ 21, 24.

[22] Financial Guarantee ¶ 3 (Doc. No. 23-2 at ECF 4); Am. Compl. ¶¶ 22, 24.

[23] Bond Agreement (Doc. No. 23-2 at ECF 2); Am. Compl. ¶¶ 25-26.

[24] Am. Compl. ¶ 23; Greco dep. at 194-95.

[25] Am. Compl. ¶ 34; Letter from Wertman to Barber, dated April 30, 2019 (Doc. No. 23-4 at ECF 2).

counsel notified SGIT of SION's default under the Deposit Agreement.  He demanded that SGIT pay Greco four million dollars by June 25, 2019, pursuant to the Financial Guarantee.[26]  On June 3, 2019, Greco's counsel sent a second letter to SION demanding the immediate return of the deposit because SION was in default.[27]

In the following weeks, Barber and Casey repeatedly assured Greco's counsel, primarily through email communications, that SION had sufficient funds to return the deposit to Greco and that the funds were forthcoming.  SION did not return the deposit. Reasons given included Barber's claim that his office had been burglarized, causing his bank accounts to be "blocked," and SGIT's retention of a new lawyer.  Greco alleges that these excuses were fabricated.[28]  The deposit has not been returned and SGIT has not paid the four million dollars due under the Financial Guarantee and the Bond Agreement. Hence, Greco filed this action.

Greco claims that the defendants conspired to swindle him out of the four million dollar deposit and the $280,000.00 bonding fee by inducing him to enter into the Deposit Agreement, the Financial Guarantee and the Bond Agreement, creating contractual and fiduciary duties they had no intention of honoring.  He alleges that SGIT made fraudulent and misleading statements about its solvency and access to liquid assets to hide the fact that it lacked the resources to satisfy its obligations under the Financial Guarantee and the Bond Agreement.  He also contends that SGIT, Casey and Moore falsely represented

---

[26] Am. Compl. ¶ 36; Letter from Wertman to Casey, dated May 31, 2019 (Doc. No. 23-6 at ECF 2-3).  The letter instructed Casey to wire the funds directly into Greco's bank account in New York.  *Id.*

[27] Am. Compl. ¶ 35; Letter from Wertman to Barber, dated June 3, 2019 (Doc. No. 23-5 at ECF 2-3).  The letter instructed Barber to wire the funds directly into Greco's bank account in New York.  *Id.*

[28] Am. Compl. ¶¶ 38-43; Emails between the parties on June 17 and June 26, 2019 (Doc. Nos. 23-7 and 23-8).

that they would "earmark and segregate at least $4,000,000 in liquid assets" and instead placed the assets overseas in a foreign bank with other SGIT funds.[29]

Greco alleges that when he demanded the return of the deposit, the defendants falsely represented that SION had sufficient funds to return the deposit to him and that it would be returned promptly.  He claims that SION was inadequately funded and used by Barber as a mere instrumentality and alter ego to evade personal liability.  He contends SION and Barber falsely represented that they would return the deposit by lying about Barber's office having been burglarized and SGIT's retention of a new lawyer.  He claims that the defendants had no intention of complying with their obligations to return the deposit and that the excuses for the delay in returning the deposit were fabricated to prevent him from discovering the defendants' prior false representations and taking steps to enforce his rights.[30]

Greco asserts five causes of action.  They are breach of contract against SION and Barber, breach of contract against SGIT, breach of fiduciary duty against SGIT and Moore, and fraud and civil conspiracy against all defendants.

## Standard of Review

Once a defendant challenges personal jurisdiction, the plaintiff bears the burden of proving, by a preponderance of the evidence, facts establishing a basis for the exercise of jurisdiction.  *Danziger & De Llano v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020) (citing *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 2002)); *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330, 336 (3d Cir. 2009)

---

[29] Am. Compl. ¶¶ 22, 30-32, 60, 67.

[30] *Id.* ¶¶ 37-43, 47-48.

(citing *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)).   In

considering a motion to dismiss for lack of personal jurisdiction under Federal Rule of

Civil Procedure 12(b)(2), as we do with a motion to dismiss for failure to state a claim

under Rule 12(b)(6), we accept the plaintiff's allegations as true and draw all reasonable

inferences from them in favor of the plaintiff.  *Shuker v. Smith & Nephew, PLC*, 885 F.3d

760, 780 (3d Cir. 2018) (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d

Cir. 2007)).  However, unlike with Rule 12(b)(6), the scope of review under Rule 12(b)(2)

is not limited to the face of the pleadings.  *Patterson by Patterson v. FBI*, 893 F.2d 595,

603–04 (3d Cir. 1990) (citation omitted) (holding Rule 12(b)(2) motion is "inherently a

matter which requires resolution of factual issues outside the pleadings").   Once a

defendant challenges personal jurisdiction, the plaintiff must "prove by affidavits or other

competent evidence" that jurisdiction is proper.   *Metcalfe*, 566 F.3d at 330 (citation

omitted).

      If there is no evidentiary hearing on the jurisdictional facts in dispute, the plaintiff

need only establish a *prima facie* case of personal jurisdiction.  *Shuker*, 885 F.3d at 780.

To determine whether the plaintiff has made this *prima facie* showing, we assume all

factual allegations in the evidence adduced by the plaintiff in jurisdictional discovery to be

true and construe all factual disputes in the plaintiff's favor.  *Metcalfe*, 566 F.3d at 330-

31, 333.

### Personal Jurisdiction Principles

      There are two types of personal jurisdiction, general and specific.  The focus of

general jurisdiction is on the relationship between the defendant and the forum state, not

on the relationship of the claims to the forum.  *Bristol-Myers Squibb Co. v. Superior Court*

*of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  The specific jurisdiction inquiry focuses on the relationship of the litigation to the defendant's contacts with the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Greco does not contend that there is general jurisdiction.  He asserts that he has carried his burden of establishing a *prima facie* case of specific personal jurisdiction.[31]

Before exercising personal jurisdiction over a nonresident, a district court must conduct a two-step analysis.  *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010).  First, there must be a statutory basis under the law of the forum state for exercising jurisdiction.  *Walden*, 571 U.S. at 283 (citing *Daimler AG v. Bowman*, 571 U.S. 117, 125 (2014)); Fed. R. Civ. P. 4(k)(1)(A).  Second, the nonresident must have sufficient minimum contacts with the forum state to satisfy constitutional due process.  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).

*Statutory Basis for Jurisdiction*

Pennsylvania's long-arm statute supplies several bases for the exercise of specific personal jurisdiction over a nonresident defendant.  42 Pa. Cons. Stat. Ann. § 5322; *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 & n.1 (3d Cir. 1998). Greco invokes two of them, sections 5322(a)(4) and 5322(b).  The statute's "tort out/harm in" provision confers specific jurisdiction over anyone who "[c]aus[es] harm or tortious injury in th[e] Commonwealth by an act or omission outside th[e] Commonwealth."  42 Pa. Cons. Stat. Ann. § 5322(a)(4); *Pennzoil*, 149 F.3d at 200 n.1.  Section 5322(b), the

---

[31] Pl.'s Br. in Opp'n to SION and Barber's Mot. to Dismiss Pl.'s Am. Compl. (Doc. No. 40) at 16; Pl.'s Br. in Opp'n to Casey's Mot. to Dismiss Pl.'s Am. Compl. (Doc. No. 35) at 15.

statute's "catchall" provision, allows Pennsylvania courts to exercise specific jurisdiction over nonresident defendants "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b), (c); *Danziger*, 948 F.3d at 129.

*Minimum Contacts with Pennsylvania*

A statutory basis for the exercise of personal jurisdiction alone is not sufficient. The exercise of jurisdiction must also be consistent with the limits imposed by the Due Process Clause of the Fourteenth Amendment. *Walden*, 571 U.S. at 283 (citing *Daimler*, 571 U.S. at 125). To meet this standard, the plaintiff must establish that "certain minimum contacts" exist between the nonresident defendant and the forum so that the exercise of jurisdiction will "not offend 'traditional notions of fair play and substantial justice.'" *Tyrrell*, 137 S. Ct. at 1558 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Specific jurisdiction arises when the cause of action is related to or arises out of the defendant's contacts with the forum. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Daimler*, 571 U.S. at 127). The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283–84 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (internal quotations omitted)).

Before a court may exercise specific jurisdiction over a nonresident defendant under the "traditional test," three requirements must be met. First, the defendant's conduct must have been purposefully directed at the forum state, resulting in contacts with the forum. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881, 883 (2011) (minimum contacts requires "contact with and activity directed at" the forum state)

(citations omitted).   Second, the plaintiff's claim must arise out of or relate to those contacts.  *Walden*, 571 U.S. at 284 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).   Third, the exercise of jurisdiction otherwise comports with "fair play and substantial justice."   *Danziger*, 948 F.3d at 130 (quoting *Int'l Shoe*, 326 U.S. at 316).

The first two requirements assess whether a defendant has the requisite minimum contacts with the forum.   *Walden*, 571 U.S. at 283.   Although the purposeful direction requirement does not require physical presence in the forum, it does require that the defendant created the contacts with the forum state.  *Walden*, 571 U.S. at 284–85 (citing *Burger King*, 471 U.S. at 475–76).  The defendant's contacts must be with the forum state itself, not just "with persons who reside there." *Walden*, 571 U.S. at 285 (citing *Int'l Shoe*, 326 U.S. at 319).   In other words, "the plaintiff cannot be the only link between the defendant and the forum.   Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285–86 (citing *Burger King*, 471 U.S. at 478).

Merely contracting with a forum resident is insufficient to justify the exercise of jurisdiction.  *Burger King*, 471 U.S. at 478.  Although mail and telephone contacts with the plaintiff may count towards "minimum contacts" with the forum, more than minimal communication between a nonresident defendant and a resident plaintiff is required to satisfy the purposeful direction requirement of the "traditional test."   *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 n.3 (3d Cir. 1998) (citing *Carteret*, 954 F.2d at 149 ("minimal correspondence alone will not satisfy minimum contacts.")).  Factors such as prior negotiations, contemplated future consequences, the terms of the contract and the parties' course of dealing must be evaluated in determining whether the defendant

purposefully established minimum contacts within the forum.  *Burger King*, 471 U.S. at 479.

The relatedness requirement demands a causal connection between the defendant's activities and the effects of that activity in the forum.  *Walden*, 571 U.S. at 284.  The relationship among the defendant, the forum, and the litigation "must arise out of contacts that the 'defendant *himself* ' creates with the forum State."  *Id.* (citing *Burger King*, 471 U.S. at 475) (emphasis in original).  There must be an "affiliation between the forum and the underlying controversy" that is connected to the defendant's conduct.  *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919).

The plaintiff's contacts are not relevant.  Only the defendant's contacts are.  Thus, no matter how significant the plaintiff's contacts are, they are not "decisive in determining whether the defendant's due process rights are violated."  *Walden*, 571 U.S. at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

For contract claims, a plaintiff must satisfy a restrictive standard of proximate causation or "substantive relevance."  *Danziger*, 948 F.3d at 130 (citing *O'Connor,* 496 F.3d at 318, 320).  He must show that the defendant's contacts with the forum were "instrumental in either the formation of the contract or its breach."  *Danziger*, 948 F.3d at 130 (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)).  For negligent torts, the defendant must have "benefited enough from the forum state's laws to make the burden of facing litigation there proportional to those benefits."  *Danziger*, 948 F.3d at 130 (citing *O'Connor,* 496 F.3d at 323).

Once a plaintiff has satisfied the first two requirements of the "traditional test" by showing with reasonable particularity that the defendant has "minimum contacts" with the

forum state, the exercise of jurisdiction is presumed constitutional, and the burden shifts to the defendant to "present a compelling case that the presence of some other considerations" would demonstrate that the exercise of jurisdiction would not comport with fair play and substantial justice. *Danziger*, 948 F.3d at 129-30 (citation omitted); *O'Connor,* 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477). The relevant factors to consider in the fair play analysis include "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

In an intentional tort case, if a defendant lacks sufficient contacts with the forum under the "traditional test," it may still be subject to jurisdiction under the *Calder* "effects test." *See Calder v. Jones*, 465 U.S. 783 (1984). *Calder* recognizes that, in certain circumstances, the relationship among the defendant, the forum, the plaintiff and the intentional tort may render sufficient a defendant's otherwise insufficient contacts with the forum under the "traditional test." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260, 265 (3d Cir. 1998). Unlike the "traditional test," which requires direct contacts with or in the forum, minimum contacts can be established under *Calder* if the plaintiff's injury, which was caused by the defendant's conduct outside the forum, connects the defendant's conduct to the forum, not just to the plaintiff. *Walden*, 571 U.S. at 288.

In *Calder*, a California resident brought a claim in California state court against the author and the editor of an allegedly libelous article and their employer newspaper. The

individual defendants were domiciled in Florida where they researched, wrote and edited most of the article.  The defendant newspaper was a Florida corporation with its principal place of business there.  The article

> concerned the California activities of a California resident, . . . impugned the professionalism of an entertainer whose television career was centered in California . . . [and] was *drawn from California sources*, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California.

*Calder*, 465 U.S. at 788–89 (emphasis added).

The Court found the defendants knew that the article would have a "potentially devastating impact" on the plaintiff's reputation and the "brunt of that injury would be felt by [the plaintiff] in the State in which she lives and works and in which the [newspaper] has its largest circulation."  *Id.* at 789–90.  Additionally, the injury to the plaintiff's reputation would not have occurred absent a large number of California citizens reading the article.  In this way, the "effects" on the plaintiff caused by the defendants' conduct outside California connected the defendants' conduct to California, not just to the plaintiff. *Walden*, 571 U.S. at 288 (citing *Calder*, 465 U.S. at 789–90).  Based on these facts, the Court found that California was "the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789.  Concluding that the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California," it held that jurisdiction over the defendants in the forum was proper.  *Id.*, 465 U.S. at 789, 791.

As articulated by the Third Circuit, the *Calder* "effects test" requires a plaintiff to demonstrate the following:

> (1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm [caused by that tort] in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]

(3) The defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus.*, 155 F.3d at 265–66.

The forum must have been the focal point of both the tortious conduct and the harm suffered. *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789). The defendant must have expressly aimed the tortious activity at the forum, knowing that the effects of its conduct were likely to be felt by the plaintiff there *and* making the forum the focal point of the conduct. *Danziger*, 948 F.3d at 130 (quoting *IMO Indus.*, 155 F.3d at 265–66).

It is not enough that the defendant's conduct affects a plaintiff who is connected to the forum state, or that the plaintiff experienced or felt the injury or effect of the defendant's conduct in the forum. *Id.* at 290 ("mere injury to a forum resident is not a sufficient connection to the forum" to satisfy *Calder*); *IMO Indus.*, 155 F.3d at 263. The "effects" of the tortious conduct must connect the defendant to the forum, not just to the plaintiff. *Walden*, 571 U.S. at 287. "The proper question is . . . whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. Thus, through his intentional conduct, "it is the defendant, not the plaintiff . . . , who must create contacts with the forum State." *Id.* at 286, 291.

Because *IMO* involved the Third Circuit's first application of *Calder* to a business tort, the court examined approaches taken by other circuits that had applied *Calder* to business torts. *IMO Indus.*, 155 F.3d at 261–64. It rejected the minority view that a court

can "automatically infer" that a defendant expressly aimed its tortious conduct at the forum just because the defendant knew that the plaintiff resided in the forum and would feel the brunt of the harm caused by its conduct there.  Noting that all companies "feel" lost sales at their headquarters, the court observed that such a broad construction of *Calder* in intentional business tort cases would mean that jurisdiction would always be appropriate in the plaintiff's home state.  *IMO Indus.*, 155 F.3d at 263 (citation omitted).

The Third Circuit adopted the majority view.  It requires that in addition to showing that the defendant knew the plaintiff would feel the brunt of the harm caused by its tortious conduct in the forum, the plaintiff must point to specific conduct by the defendant that was intentionally targeted at and focused on the forum.  *Id.* at 265–66.

### Analysis

Greco contends that Casey and Barber expressly aimed their tortious conduct at Pennsylvania.  He argues that the defendants, knowing that he was a Pennsylvania resident conducting business from Pennsylvania, purposefully directed their activities toward him in Pennsylvania via their e-mail, text messages, telephone and Federal Express communications to him and his counsel regarding the negotiation and performance of the deposit, the bond and the financial guarantee agreements.[32]  Because he is a Pennsylvania resident who maintains a bank account in Pennsylvania, Greco argues he was the focal point of the harm suffered and bore the brunt of the harm in Pennsylvania.[33]

---

[32] Pl.'s Supp'l Br. Regarding Jurisdiction (Doc. No. 117) at 2.

[33] *Id.* at 3.

In response to the motions to dismiss, Greco submitted affidavits and documents in support of the exercise of specific jurisdiction over the defendants.  After holding oral argument, we granted Greco the opportunity to conduct jurisdictional discovery and allowed the parties to submit supplemental briefs.  The following evidence was adduced in the course of jurisdictional discovery.

At the time of the negotiation of the agreements, Greco resided in Bryn Mawr, Pennsylvania, where he still resides.[34]  Greco describes himself as a self-employed Pennsylvania-based entrepreneur who "carried out [his] business operations from Pennsylvania."[35]  He was at his home in Pennsylvania when he spoke on the phone with the defendants and executed the legal documents in this case.[36]  Although Citibank of New York executed the wire transfer of the deposit from Greco's bank account to SION's in accordance with the Deposit Agreement, Greco initiated the transfer from Pennsylvania when he called the Conshohocken, Pennsylvania office of his investment firm, Morgan Stanley, and instructed it to order the transfer.[37]

According to Greco, Barber and Casey knew that he resided, conducted business, and was present in Pennsylvania when they communicated with him and his attorney during the course of the transaction.  With respect to Barber, Greco claims that he knew he was a Pennsylvania resident from their phone, email and FedEx communications.  He

---

[34] Greco dep. at 31-32, 41, 144, 171-72.

[35] Pl.'s Br. at 10 (Doc. No. 40); Pl.'s Br. at 10 (Doc. No. 35); Certification of Greco (Doc. No. 40-3) ¶¶ 5-6; Certification of Greco (Doc. No. 35-2) ¶¶ 5-6.

[36] Pl's Supp'l Br. at 7; Greco dep. at 144.

[37] Greco dep. at 92, 258.  Citibank of New York executed the wire transfer because it is the clearing bank for all Morgan Stanley offices across the country.  *Id.* at 92.

testified that he had approximately four telephone conversations with Barber in the weeks prior to the closing. Three were conference calls with Wertman and Kurz, where the participants called in to a general conference call number. Although he was unable to recall exactly what was discussed during the conference calls, Greco testified that Barber "knew [he] was a Philly guy" because "[i]t was part of the conversation."[38] The fourth phone call, which was between Greco and Barber, was initiated by Barber. Greco contends that because Barber called him on his cell phone, which had a "610" area code, he was alerted to the fact that Greco was in Pennsylvania during the call.[39]

When Greco emailed the defendants, he did not include his mailing address or phone number.[40] His attorney Wertman prominently displayed his Philadelphia, Pennsylvania office address and phone number at the end of his email communications. Greco contends that Barber's receipt of and replies to Wertman's emails in March, May and June of 2019 put him on notice that Greco worked and resided in Pennsylvania.[41]

Greco contends that Barber knew he was a resident of Pennsylvania because he "coordinated the mailing of legal documents at issue in this case to Greco in Pennsylvania" and "communicated to get Greco's address by an email."[42] He points to

---

[38] Greco dep. at 70-71, 176-77, 188. Greco also points to an affidavit submitted by Kurz, who attested that Greco's Pennsylvania residency was discussed during these phone conversations. Aff. of Robert Kurz (Doc. No. 114-16) ¶ 4.

[39] Greco dep. at 70-71, 176, 188.

[40] *Id.* at 37, 39, 43, 175. In communicating with the parties to this action, he only used his "jjgreco@strategicrmllc.com" email address, which is related to his personal consulting business, Strategic Resource Management, LLC.

[41] *See, e.g.*, March 15, May 29, and June 17, 2019 emails between Barber and Wertman (Doc. Nos. 114-12, 114-25 and 23-7, respectively).

[42] Pl's Supp'l Br. at 6-7.

two email chains.  The first was initiated by Croxford on August 27, 2018, where, in an email to SGIT and Casey, she instructed them to execute the enclosed Financial Guarantee and the Bond Agreement and send them to Barber.  SGIT replied to her email, confirming that they had sent the documents by FedEx to Barber.[43]  The second email chain was initiated three days later by Karen Canton,[44] who directed Barber to sign the bond SGIT had sent him and mail the original to Greco.  She also requested Greco to provide his mailing address to Barber.  In response to Canton's requests, Greco emailed Barber his Pennsylvania address, and Barber sent Greco the original signed document there.[45]  Greco executed the legal documents at his home in Bryn Mawr, Pennsylvania.[46]

With respect to Casey, Greco testified that the two of them had approximately six telephone conversations between August 21 and August 27, 2018, discussing the bond and the guarantee agreements, SGIT's ability to back the bond with substantial assets and SGIT's promise to segregate the deposit from its general pool of assets.[47]  Unlike his conversations with Barber, Greco does not contend he told Casey he was a Pennsylvania resident.  But, as he did with Barber, Greco points to emails between Casey and Wertman that he argues put Casey on notice that Greco worked and resided in Pennsylvania.  He

---

[43] *See* Aug. 27, 2018 email string between Croxford, SGIT and Casey (Doc. No. 114-7 at ECF 2).

[44] No party has told us who Karen Canton is or where she works.  Based on emails and testimony from Sherry Sims of SGIT, Canton appears to be an insurance agent who works for or with Croxford.  *See* Aug. 21, 2018 email from Croxford to Ryan Wertman (Doc. No. 23-3) (stating that she "was approached by Karen Canton to seek out a surety market that could provide a pure financial guarantee surety bond to protect the assets of Joseph Greco."); Sims dep. at 73 (stating that she talked to Canton and Croxford to find out why Barber had not paid Greco the four million dollars).

[45] *See* Aug. 30, 2018 email string between Greco, Barber and Canton (Doc. No. 114-8); Greco dep. at 174.

[46] Pl's Supp'l Br. at 7; Greco dep. at 144; Barber dep. at 18-20.

[47] Greco dep. at 179, 190, 227-28, 242, 259.

asserts that as early as August 23, 2018, Casey and Wertman exchanged emails, where Wertman's Philadelphia office address was prominently displayed at the end of his emails.[48]

Greco argues that he has presented sufficient evidence to establish the exercise of personal jurisdiction over Barber, SION and Casey.  He contends that when Barber and Casey communicated with him and his attorney via email, phone, and FedEx, they were aware that he resided and conducted business in Pennsylvania.  So, he argues, they knew he would feel the harm resulting from their conduct in the forum.  Thus, Greco maintains Barber's and Casey's contacts with him were expressly aimed at Pennsylvania, meeting the requirements of the *Calder* "effects test."

Greco argues that, for the same reasons, the first two requirements of the "traditional test" are met with respect to the contract claim against the SION defendants. He contends that Barber and SION have purposefully directed their activities towards him in Pennsylvania in connection with the negotiation, execution, performance, and breach of the agreements upon which the claims in this case are based.

Because we did not conduct an evidentiary hearing on jurisdiction, Greco need only establish a *prima facie* case of personal jurisdiction.  Under that standard, we assume all uncontested factual allegations are true and construe all factual disputes adduced in jurisdictional discovery in his favor.  *Metcalfe*, 566 F.3d at 330-31, 333.  Applying this standard, we find that Greco has not demonstrated a *prima facie* case that there is specific jurisdiction under either the "traditional test" or the *Calder* "effects test."  Under both tests,

---

[48] *See, e.g.*, Aug. 23, 2018 and June 2019 emails between Casey and Wertman (Doc. Nos. 114-9 at ECF 3, 23-7 and 23-8, respectively).

the defendant's "suit-related conduct must create a substantial connection with the forum State," and the defendant's contacts must be with the forum state itself, not just "with persons who reside there." *Walden*, 571 U.S. at 284–86, 290–91.  In this case, the defendants' contacts, alone or together, do not meet these requirements.

Construing all factual disputes in Greco's favor, we find that Barber and Casey knew that he resided and conducted business in Pennsylvania.  Greco identifies four phone calls he had with Barber.  Three of them were conference calls, during which, as Kurz attests, it "came up in conversation" that Greco was from Philadelphia.  The fourth call alerted Barber to the fact that he was in Pennsylvania because Barber called him on his cell phone, which had a "610" area code.  Greco points to multiple emails among Wertman, Barber and Casey, with Wertman's Philadelphia office address prominently displayed at the bottom of each email.  Just because a lawyer is from Philadelphia does not mean that his client is.  But, Greco did provide Barber his mailing address, and Barber sent Greco the Financial Guarantee and the Bond Agreement for his signature to him in Pennsylvania.

Knowledge that Greco was a Pennsylvania resident who conducted his business there is not enough to establish the first requirement of the "traditional test," which requires that the defendant purposefully directed his conduct at the forum state such that he created the contacts with the forum.  The contacts Greco identifies do not meet this requirement.

None of the defendants initiated the transactions.  The evidence Greco produced shows that *he sought out the defendants*' participation in the transactions, not the defendants.  Tribe reached out to Greco for assistance in securing a credit facility.

Korakianitis, who knew both Barber and Kurz, brought the deal with Tribe and Greco to Barber for SION to serve as the fiduciary for the deposit.[49]  Greco hired Croxford, the bond broker based in Arizona who introduced SGIT and its attorney Casey to Wertman.

With respect to the single mailing Barber sent to him in Pennsylvania, Greco mischaracterizes it as Barber "coordinat[ing] the mailing of legal documents at issue in this case to Greco in Pennsylvania" and "communicat[ing] to get Greco's address by an email."  In fact, Canton and SGIT, not Barber, coordinated the mailing and directed Barber where to send the bond for Greco's signature.  Greco provided his address to Barber at Canton's behest, not Barber's.  Additionally, Barber initiated only one call to Greco.

Greco fails to identify more than "minimal communication" with the defendants in Pennsylvania to satisfy the purposeful direction requirement of the "traditional test."  *See IMO Indus.*, 155 F.3d at 259 n.3 (citation omitted).  Merely contracting with a forum resident is insufficient to justify the exercise of jurisdiction.  *Burger King*, 471 U.S. at 478. Most of the contacts between the defendants and Greco were initiated by him in Pennsylvania and directed toward the defendants in Utah and Texas.

Greco has not shown that the defendants' contacts with the forum were "instrumental in either the formation of the contract or its breach."  *Danziger*, 948 F.3d at 130 (citation omitted).  Although Greco was in Pennsylvania when he spoke on the phone to the defendants and when he signed the agreements, Casey and Barber were located in their respective states of residence when they signed.  Additionally, the Deposit Agreement contained a forum-selection clause in which the "parties submit[ted] to the

---

[49] Barber dep. at 181, 193-94, 199, 248.  Crawford described SION as a company that invests in major mining and construction projects worldwide and is worth billions of dollars, ten million of which is in gold bullion.  *See* Aug. 17, 2018 email from Croxford to SGIT (Doc. No. 114-11) at ECF 2.

courts of Utah as the sole and exclusive jurisdiction to settle any disputes arising" out of the agreement and agreed that Utah law governs.  The guarantee provided that it was governed by Texas law.  Hence, there was nothing significant about Pennsylvania to the formation of the agreements or to their breach.  *See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 151-52 (3d Cir. 1996) (where California defendant had signed contract in California and mailed it to the plaintiff in Pennsylvania and defendant's only other contacts with Pennsylvania were a few telephone calls with the plaintiff, contacts were not sufficient to establish purposefully directed activity at the forum); *Cioli v Iravani*, 651 F. Supp. 2d 356, 370 (E.D. Pa. 2009) (holding that limited exchange of emails and phone calls between nonresident defendant and a Pennsylvania resident insufficient to show purposeful availment of forum).

We conclude, based on these facts, there are insufficient minimum contacts with Pennsylvania under the "traditional test."[50]  Because Greco asserts intentional tort claims, we apply the *Calder* "effects test."  Greco also fails this test.

Greco has satisfied the first and second prongs of the *Calder* "effects test."  He states causes of action for intentional torts.  He also has shown that he felt the harm of financial loss in the forum as a result of the defendants' conduct.  Because he resides and banks in Pennsylvania, he suffered a pecuniary injury in Pennsylvania.  Even though Citibank of New York executed the wire transfer of the four million dollar deposit from his to SION's bank account in accordance with the Deposit Agreement, he initiated the transfer from his bank in Pennsylvania when he instructed the Conshohocken, Pennsylvania office of his investment firm to order the transfer.

---

[50] Because we conclude that Greco does not meet his burden of demonstrating the defendants' minimum contacts with Pennsylvania, we do not reach the fair play analysis prong of the "traditional test."

Construing all factual disputes in Greco's favor and accepting as true the undisputed ones, we find that he felt the brunt of harm caused by the defendants' actions in Pennsylvania, making the forum "the focal point of the harm" he suffered.  Even though the funds went through a New York bank to a Utah bank, the authorization to release them came from Pennsylvania.  Thus, Greco suffered the loss where he lived and ran his business.

Although he has satisfied the first two prongs of the Calder "effects test," Greco has not satisfied the third.  He has not shown that the defendants "expressly aimed" their tortious conduct at Pennsylvania, making *the forum* the target of their tortious activity.  He merely contends that because the defendants were aware that he conducted his business operations in Pennsylvania and knew their tortious conduct would cause him harm there, their conduct was "expressly aimed" at the forum.  Knowing that any harm they caused would be felt by Greco in Pennsylvania is not enough to demonstrate that the harm connects the defendants' conduct to *the forum*.  *See Walden*, 571 U.S. at 285-86 (A "defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. . . . Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State," not just "with persons who reside there."); *Cioli v Iravani*, 651 F. Supp. 2d 356, 371 (E.D. Pa. 2009) (even where the parties disagreed about whether the defendant knew the plaintiff was a Pennsylvania resident when he communicated with him, the court held that resolution of the factual dispute was unnecessary because a defendant's knowledge of a plaintiff's residence is not sufficient to meet the third prong of the *Calder* "effects test").

The minimal contacts the defendants had with Pennsylvania are too attenuated to connect them in a meaningful way to Pennsylvania and to conclude that the defendants expressly aimed their conduct at Pennsylvania.  Therefore, Greco has not met his burden under the *Calder* "effects test."

### Conclusion

Greco has not met his burden of establishing a basis for exercising specific personal jurisdiction over the defendants under either the "traditional test" or the *Calder* "effects test."  He has not shown that the defendants purposefully directed their conduct at Pennsylvania.  Nor has he shown that the defendants "expressly aimed" their tortious conduct here, making *the forum* the target of their tortious activity.  Therefore, we shall grant the defendants' motion to the extent that it raises lack of personal jurisdiction.

Pursuant to 28 U.S.C. § 1631, rather than dismiss the action, we shall, in the interest of justice, transfer it to the United States District Court for the District of Utah where this action could have been brought when it was filed.